Manion Anderson, as you know, represent the plaintiff appellate Miss Portia Ishee. Your honors, the district court's decision should be reversed for several reasons I'd like to discuss here today. First, the district court erred when it failed to appreciate the summary judgment standard and how it relates to Mississippi agency law. Specifically, the judge failed to credit what we would deem substantial amounts of evidence indicating an agency relationship in violation of the summary judgment standard, while also failing to acknowledge Mississippi jurisprudence that an agency relationship is generally a question of fact for the jury. And also, sister opinions which have held that what candidly I would deem as slight evidence constitutes an issue material fact for the Second, the district court erred in determining there were no breaches of contract. It seemed to take an approach of analyzing it as a negligence case when it looked at these breach of contracts claims. It discussed things like reasonable reliance and what information was available to the party to the contract. Your honors, as you well know, why don't you just tell us why the Fannie Mae should be liable for the acts of GMAC in this case? Yes, your honor. First, that goes to the legal theory of agency. Agency is based on this idea of the right to control, quote unquote the right to control. That's it, the right to control. So that's what we're looking for in determining this agency relationship. Now, in Mississippi, the courts have been fairly steadfast in holding that, this whole idea of agency. First, it's a jury issue. And in furtherance of that, the courts have been, again, in my opinion, lenient in what amount of evidence is needed to pass the summary judgment standard. And I'll point you to some cases. For example, the Walker case. There, there was a contract saying that the principal would provide insurance for the alleged agent. That was the only evidence in favor of an agency relationship. And the Mississippi, that case, Court of Appeals case, said that's enough. That's a fact question for the jury. Also, see the Font case. There, the only indication of an agency relationship was that the alleged principal in contract said that we own the records of this proposed agent. That's it. The same thing was here. Fannie Mae owned the records of GMAC. It owned the records of Green Tree. Court of Mississippi Supreme Court, that's enough. And here we have more. See also the Miller case. The only evidence there was the fact that the principal controlled some of the ways fees were charged and collected from its alleged agent, a convenience store owner. Mississippi Supreme Court said, well, if they're getting their revenues from the public, not necessarily the agent, and they can control how the agent prices these things, that's enough control over pricing. And again, the revenues come from the public, not from Green Tree or GMAC. The money's coming from the public, just like in the Miller case. And when we speak about substantial control, we're talking about guides and other evidence as well. And so Mississippi case law has been almost uniform that you really just need one piece of evidence to show that an and that question goes to the jury to decide. In this case, we have several, Your Honor. First, and what I believe to be the absolute most important, are the three Form 176s that GMAC and Green Tree, the servicers, the alleged agents submitted to Fannie Mae. The whole genesis of this lawsuit is the failure to apply insurance in 2010. Well, GMAC sent the Form 176s to Fannie Mae saying, hey, Fannie Mae, give us the thumbs up or the thumbs down on whether or not to apply these funds and close out the loan. Fannie Mae said no three separate times. If there's no control, no agency relationship here and GMAC truly is independent, why was Fannie Mae given that opportunity to begin with? That is the ultimate issue in this case. If they would have applied the proceeds when they were first asked to, we would never be here. If there is no agency relationship, no control, why did Fannie Mae even have that opportunity if GMAC is truly independent? In this particular case, they had that opportunity in this particular case? Three times. Three times servicers sent these Form 176s to request permission to apply the insurance funds. The district court found there was no control, but again, that's just belied by the Form 176s and additional evidence. Another additional evidence that I think is important is the prospectus that was mentioned in our briefs. Fannie Mae issues a prospectus to its shareholders. It says in there, we're responsible for our servicers' actions. In fact, we are the ultimate servicer and we bear all responsibility. That's an open letter required by the SEC. The public can view it. The district court said it was irrelevant for whatever reason. In the Walker case, the Mississippi Court of Appeals said, well, because the proposed principle here is assuming responsibility. What was the basic holding of the district court here? What was the grounds upon which the district court chose to rule against your position? They said we didn't create an issue of material fact and failed to even... In what respect did they say you failed to create? We couldn't prove an agency relationship. It was very vague. They didn't credit... He did not credit any of our evidence, including the Form 176s, including the perspective, including the notes that Fannie Mae took, and including the servicing guide. He did not address those issues that you raised? He addressed the prospectus and held that it was irrelevant, and we contend that that's a statement against interest there. Did he say why it was irrelevant? No. He dismissed it in three sentences of a 50-page opinion, and so, no, it's still... He wrote a 50-page opinion. He must have said a lot. The facts in this case were pretty extensive, and the plaintiffs alleged numerous causes of action that we could not... No way to fit into the brief here. Let me ask you, can you show me in the record where those three requests are that were made by G. Mack to Fannie Mae? Yes, Your Honor. In three separate times? Yes, Your Honor. I have the site in my notes. Could I give you that in my rebuttal? The site's in that record, but yes. If you get it in your rebuttal, give it to the clerk, and they will forward it to us. Okay. Yes, Your Honor. One of the Form 176s was actually produced in discovery. Two other ones were destroyed. And what is the purpose of this form? It's for the servicer to request permission from Fannie Mae to apply this insurance, these insurance monies, to the loan to close it out. The government that she got from the house... The house burning down. Yes, Your Honor. There was an alpha policy of insurance. The house burned down. They paid it pursuant to Mississippi's mortgage clause. They pay off the loan. The rest goes to the consumer. And so alpha called, got the loan amount, sent the amount to G. M. A. C. For whatever reason, it sat in a quote-unquote unapplied funds bucket, whatever that means, until we filed the complaint. And when did they forward it to Fannie Mae? I thought you said they forwarded it to Fannie Mae on three separate occasions. Correct. Form 176 was committed on, sent on three separate occasions. I do not have the specifics. To Fannie Mae? To Fannie Mae. Is that in your brief? Yes. And the record citations are in the brief. One of the Form 176s is in the appendix. The other two, we only knew about them because they are in Fannie Mae's claim notes. They couldn't produce the actual Form 176s, but we discussed it in deposition. And in deposition, Fannie Mae admitted that they received the Form 176s and that they denied applying the funds. This is in evidence. Yes. Yes. The record in this case is 13,000 pages, I believe. It's extensive. You're saying by that form that the decision to not apply the proceeds properly was transferred to Fannie Mae? That Fannie Mae made that decision? Is that your argument? No, not that the property was transferred to Fannie Mae. That Fannie Mae had control over whether or not to apply the proceeds. Decision? They had control of the decision, yes. You're saying that these three pieces of evidence established that? And more, yes. I believe those are the three most important pieces of evidence here, but there's more. The prospectus, and we quoted that in our brief as to what that says. They say we're responsible for all of these servicing loans. Also, in their deposition, Fannie Mae admitted that they're responsible for controlling who's hired as foreclosure counsel. The Underwood Law Firm in Jackson was hired despite the fact that they have this check over here to pay off the loan and it's not applied, so their computer system is dinging them saying, loan in default, Fannie Mae controlled the foreclosure counsel. Foreclosure counsel sends a letter, several letters, six letters total, to our client saying, we represent the holder of the note, being Fannie Mae. Being Fannie Mae saying, you're in default, we're instituting foreclosure proceedings. So that's another piece of evidence. The servicing guides, which are 400 and some odd pages, also show control. The amount of control they exercise over their agents here is just something else. You direct me in your brief where you indicate these three instances in which Fannie Mae itself denied the right of the bar to take the proceeds of the insurance policy applied to her. Yes, Your Honor. Are there any other questions I can field while I'm here? I'm specifically looking in the reply brief right now because I can do it in rebuttal, but just a note in rebuttal to first, precisely to the brief, pages in the brief where you make the point with respect to these three occasions in which Fannie Mae denied the mortgagee to apply the proceeds to eliminate his loan. Yes, Your Honor, I sure will. So let's talk about the, since agency deals with the control and right to control, I'd like to speak about the control that these servicing guides that Fannie Mae forces its servicers to follow have. And again, it's huge amounts of pages. We have to summarize in our brief the amount of control they exercise here. First, the servicer could only terminate the contract with the permission of Fannie Mae. Now, they are competing a piece of evidence on this point. A portion of the contract says, well, both sides can terminate whenever you want, but servicer, you've got to follow the servicing guide. You're going to look in the servicing guide and it's a, you know, several page lengthy addendum to it that says, well, you actually have to have our written consent before you can terminate this contract. Mississippi is very clear that that's evidence of control. The servicing guide also controls the amount they pay. They set the fee schedule. What part of the servicing guide are you referring to? Can you give us, I mean, that is extensive. If you don't have time today to furnish the specific references that we've asked for, then do it after the argument, but make sure that you supply the same information to Mr. Twyford. I will. Yes, sir. I sure will. And it's also in the brief, and I'll point to that in my rebuttal as well. They also have to make reports. There are 40 pages of the servicing guide that says what reports Fannie Mae requires. That's not indicative of an independent contractor. When I think of an independent contractor, I think of Mike Cownie. I mean, I pay him, he does my taxes, it's done. I don't have the right to go and audit his books when I want to for all the business, like Fannie Mae did here. I don't have the right to force him to tell me about his financials whenever I want. I don't have the right to make him use the software that I choose, like Fannie Mae made them. I'm not allowed to go inspect his premises at any time. Fannie Mae was able to inspect the premises. What Mississippi Supreme Court has said, that's a factor in deciding this agency relationship. They could do it whenever they wanted to. There's more. I'm running out of time. I'll address the rest the best I can in this case. Thank you, Your Honor. May it please the Court, I'm Hunter Twyford, and I'm representing Fannie Mae and Green Tree in this appeal. Let me just, if I can, jump right into the topics that Mr. Anderson brought up and see if I can address them, starting with Form 176s. I think, obviously, the Court's got some interest in that. Mississippi has mischaracterized what a Form 176 is. A Form 176 is a request from a servicer to apply insurance proceeds or other proceeds and short pay a loan. If there's not sufficient money to pay off a loan, the servicer sends a Form 176 with backup information. Fannie Mae then makes a recommendation back to the servicer as to what Fannie Mae would like to see them do, but it's nothing more than a recommendation. Where's the record citation for that? Oh, Your Honor, that's, I mean, as far as the . . . Well, are they in, there are some of these forms in the record? Yes, ma'am. Or can we take judicial notice in federal regulation? No, ma'am. They are all referred to in the Fannie Mae deposition testimony, and that's where all of this comes out, is in the Fannie Mae deposition testimony. Right, but now, if GMAC or whomever the servicer might have been had disregarded the recommendation of Fannie Mae, how long would they have stayed on the contract with Fannie Mae? Your Honor, they did, they ignored the recommendation. And did they apply the proceeds? Oh, no, they didn't, Your Honor, and here's what happened. The first Form 176 was in November of 2011. GMAC had been servicing the loan since origination in 2006. The fire was in 2010, September 2010. The insurance proceeds were paid to GMAC in, I mean, November of 2010. Apparently, and we don't have GMAC's records, because, you know, frankly, they're not a party to this lawsuit, and no discovery was taken from them. But in any event, Fannie Mae did produce a Form 176 that was sent by email from GMAC in November of 2011. What it said was, Ms. Ishii's loan right now is severely delinquent. We're holding $98,000 roughly in insurance proceeds. We'd like to short pay the loan and write off $15,000, because that's what GMAC's records that they provided to Fannie Mae showed the deficiency to be at that point in time. And so what Fannie Mae said on that one was, send us more information. We'd like to see the value of the property. GMAC didn't respond. Six months later, GMAC sent a second Form 176 and said, now we got a $20,000 deficiency. We'd still like you to short pay it. Provided no more information about where the insurance proceeds came from. All they got was, we got $98,000. They now owe $120,000. So write off $20,000. Fannie Mae came back, Your Honor, and said, we recommend that you continue foreclosure. GMAC never foreclosed. They didn't do that. And then we have the third Form 176. Servicing was transferred from GMAC to Green Tree, effective February 1, 2013, out of the GMAC RESCAP bankruptcy. And Green Tree sent a Form 176. All they had was the records they had imported over from GMAC. And they showed at that time, at the time the loan was transferred, the loan was delinquent, the loan was in foreclosure status, and there was a $25,000 deficiency. They sent the Form 176 recommendation, Green Tree did, to Fannie Mae. Fannie Mae said, as a matter of fact, Green Tree went a step further and sent an inspection of the property that showed that the property was occupied, had roughly a $100,000 value, that it was tenant occupied. And Ms. Ishii bought a trailer and put it on the lot and apparently the inspector thought that Ms. Ishii's daughter was occupying the mobile home and they had built some structure around it. So there's no reason to question the value. Fannie Mae says— Why didn't all this that you're referring to here establish enough of control to go to a jury? Your Honor, the reason it didn't is because Fannie Mae simply made recommendations back to the servicers— It sounds to me like that may be a question of fact, whether that's a recommendation or not. Well— You can call it a recommendation, but because you call it a recommendation, it doesn't make it so. And I don't disagree, Your Honor, depending on how it's couched. But again, there was never a foreclosure. Neither servicer followed that recommendation. So there can't be much control if—and there was no— Before a jury decided why they didn't follow the recommendation, was it an absence of control or it was just an absence of follow-up or what was it? But they clearly were asking Fannie Mae for approval to do something or—and they say—and Fannie Mae, protecting itself, says, well, we recommend you do so and so. And what did that mean to the servicer when the person with whom they had the contract says, we recommend you do so and so? I mean, why isn't that a question of fact? Your Honor, I don't believe it is because I don't think that that shows sufficient control over the day-to-day servicing activities—  —to arise—I'm sorry. If a jury found that that was sufficient evidence to establish an agency relationship, what would be your fallback position that you are still not liable? The Merrill Doctrine, frankly, in all honesty, Your Honor, Fannie Mae would immediately say the Merrill Doctrine would prohibit an agent from acting outside the course and scope of the agency and the directives— But he's not. That's the whole point. I mean, because he's— But he would be, Your Honor. He would be because he didn't follow the recommendation. Well, he didn't follow the recommendation to— To foreclose the property. —foreclose. Yes, sir. Wouldn't that have made the damages worse, Mr. Twyford? It would have, Your Honor. Is that what you're saying? No, no, I'm not. And thank goodness there was never a foreclosure. And thank goodness that there was never— Foreclosure was nothing. I mean, the house was gone then, wasn't it? It was rebuilt on the same property, Your Honor. Or the mobile home was, or another house was? The mobile home was, but it met the definition of a house under the Mississippi law. Well, so I— Yeah, I think the Merrill Doctrine would apply in that circumstance if, you know, if a jury were to—or if the court were to go back and look at the agency issue and say that that's a question of fact for a jury. But Judge Starrett looked carefully at the Form 176s in the opinion. What did he say? He concluded that that was not evidence of control. Why? Because that he did not see that as rising to the level of control required by the Mississippi law on a day-to-day, detailed, down-in-the-weeds type control that's required in order for there to be vicarious liability. And he did the Kisner analysis using the evidence that Mr. Anderson referred to. He went through the perspectives. He went through the letters from Mr. Underwood, the foreclosure counsel. And I have to correct one thing that Mr. Anderson said, which I'm sure it was inadvertent. GMAC hired foreclosure counsel. Fannie Mae had nothing to do with it. And as a matter of fact, Mr. Underwood's deposition testimony was because of the coding. They didn't recommend foreclosure, though. They did, Your Honor. But Mr. Underwood was hired back in November 2010 because Mississippi at that time was four months delinquent. But did he say, did the Underwood firm represent, we are the holder of the note? He said, we represent GMAC, the holder or servicer of the note. Or the agent for the holder or servicer of the note. And that's the form letter that Mr. Underwood sent out. In this case, I can't answer, Your Honor, because the record is totally silent on that, other than Mr. Underwood did not know that Fannie Mae was even involved. So I guess if, looking at it at the time the letter went out, because of the coding by GMAC, that there was absolutely no mention of Fannie Mae, Mr. Underwood testified at his deposition that the first time he knew this was a, Fannie Mae was even involved was in this litigation. And when he was subpoenaed, as far as this litigation is concerned. All right. Assuming that we find that there is evidence of agency relationship here by virtue of these forms and the request with respect to these forms and the response with respect to these forms, what is your argument then that still this is not enough to establish a relationship to hold Fannie Mae liable for the conduct complained of here? My response there, Your Honor, would be twofold. First, examining the relationship under the Kisner factors, which I think is still applicable here, ends up showing that it's an independent contractor status. Why? For several reasons. One of them, Fannie Mae guides are strictly that. They are guides. They say it creates an independent relationship. And I certainly concede that the court has the right to go behind that and to see whether that's simply contractual drafting to avoid liability, which Judge Sterritt did, by the way. He went behind that and he looked at that. I'm not stopping here that it says it's an independent contractor relationship. But the guides say that they are broad parameters by which we expect the servicers to adopt their own rules and regulations and to service loans in accordance with their own rules and regulations. Testimony in the record. The only testimony about this, and it comes from both Green Tree and from Fannie Mae, is that's exactly what happened. If you take a step backwards and you look at the Fannie Mae guide, that controls every relationship that Fannie Mae has with any servicer of any Fannie Mae loan in the country. And they are so broad and each servicer is expected to adopt rules and regulations and protocols and policies and procedures. You know, this strikes me as quite analogous to the National Flood Insurance Program, where the government pays, you know, sets the premiums and has a body of federal regulations that control how insurance companies service their agents. Is there anything worthwhile in our pursuing that analogy or not? Yeah, I frankly hadn't thought of that as being the analogy because, I guess, of the unusual relationship that Fannie Mae and the other GSEs have of being independent, but yet. Well, the Flood Insurance Program works almost exactly the same way, except, again, they have their detailed regulations, but the agencies have to apply those. And anyway, post-Katrina, we had a bunch of cases about that. Right, right. And frankly, Your Honor, I'm not prepared to discuss that as an analogy. It was more analogous to me that the American Institute of Architects adopts the AIA guides and it tells you how thick your steel has to be or how you finish your concrete. And yet, there's no question but I, as a builder, working for an independent or for a developer, even though they're the AIA guides, I'm a contractor. Even though I'm told to follow the AIA guides, it's up to me to do that. The AIA doesn't have a financial stake in it, though. They wouldn't ultimately take the property, would they? I'm sorry, Your Honor. Architects. Isn't there a difference here? Doesn't Fannie Mae have some sort of potential liability? They're making money. I don't think they wouldn't do it. Well, and in this particular case, Fannie Mae had, and that sort of leads me to the point of the prospectus, and I'll mention it very quickly, but Fannie Mae had taken this loan out of the pool, out of a securitized pool in December 2010 and put it in its own portfolio. So Fannie Mae stood to lose in the event that the loan didn't pay. So to the extent, I mean, that's the financial interest that Fannie Mae had in the case. And that's another reason the prospectus was, well, irrelevant, is because Ms. Ishii's loan wasn't governed by the prospectus. This is just an absurd handling of an account, I think. I'm sorry, Your Honor. Absurd handling of an account. By GMAC. Somewhat. Well, the testimony's clear that everything we're talking about now was done by GMAC. So the question is, I think, pure, sweet, and simple, is Fannie Mae vicariously liable for GMAC's servicing activities under Mississippi law? And what we maintain is the answer to that is no. Actually, GMAC wanted to write it off and let the woman off the hook. And Fannie Mae says, no, you can't do it. Or at least we've got to have more information to do it. And ask for more information, which they weren't provided on the first day. They refused to give the permission to do it. They did, Your Honor, but— They recommended. Well, and Your Honor, the testimony in the record by the Fannie Mae representative is that based on the information that GMAC gave them, it was a lousy business decision. So that's why they recommended not doing so. I'm not saying that. I mean, I couldn't agree with you. The fact that they responded to it, though, and that GMAC acted—I suppose they acted in the basis of that response because they did not write it off at that point, accepted the recommendation, but they didn't foreclose. Okay, Mr. Twyford, does that conclude the point you wanted to make? It does as far as Fannie Mae is concerned, Your Honor. Would the Court like to hear anything about the Greentree side of this? I'm prepared to address it if you'd like. There were no arguments made by—about Greentree here. Okay, then— You certainly not waived anything. It's in the brief. And it absolutely is, Your Honor. Very quickly, if I may. Sure. The Mississippi cases that Mr. Anderson quoted, frankly, I think we all line up in the same place, and that is, if there is a material issue of fact, then it's a question of fact for a jury, the relationship between Fannie Mae and its servicers. If there is not a material issue of fact, it's a question of law. And all the cases that are cited, really by both sides in the briefing, say that. Here, you have the testimony of Fannie Mae, you got the testimony of Greentree, and you got the servicing guides. And that's what constitutes the record. And Judge Starrett did, I thought, an excellent job of going through each of those points and saying, well, first, Fannie Mae made sufficient points to shift the burden to Ms. Ishii. Ms. Ishii didn't respond with facts in the record. And he even cites the case law that says it's not the court's obligation to go and to search the record for facts. And he concluded at the end of the day that there were no material issues of fact, therefore, the determination of the relationship is a question of law, and summary judgment was proper. And we think he got it right in this case. Okay, thank you very much. Thank you, Your Honor. Mr. Anderson, you've saved some time for rebuttal. Yes, sir, thank you. If you have your pens ready, I'd like to first respond to your request for the record. For the Form 176s, it's mentioned in our brief, our principal brief on pages 27 and 28. Reply brief, 8 through 10 in the record. 7291 through 7294. Also, 7297 through 7298. Also, 7304 through 7307. Also, record excerpts tab 6. Also, 4973, 49603, and 4904. Now, so, and he wants, he says Fannie Mae's deposition testimony. So let's just read an excerpt of that. Question. To Fannie Mae, and this is the record at 4971. Well, in fact, that's why all the Form 176s were rejected by Fannie Mae and sent back for foreclosure, wasn't it? Because you were exercising control over the servicing, right? Answer. We did exercise control. You're correct. When they submitted the 176s to Fannie Mae, they did review them. Question. But the servicer was required to abide by Fannie Mae's decisions in those occasions, wasn't it? Answer. That's correct. Legally speaking, of course, practically speaking, we care. Legally speaking, we can't care what the decision Fannie Mae did as far as reject or accept the Form 176s. The point is, they were the ultimate decision maker. That's an exercise of control. That is the ultimate exercise of control to either accept or deny these proceeds and close out the loan. He wants to talk about, excuse me, the defendants talk about default. There is an error on their part, on the defendant's part, for them even believing the loan was in default. They had a payment in full from the insurance company. None of that was Ms. Ishii's fault. They also mention the guides are just guidelines. That's not true at all. They're contractually obligated to follow the guides. The contract is in the record at 2851. One of the provisions is, you got to follow our guides or else you're getting the boot. Okay? Uh, foreclosure. They had foreclosure counsel. Fannie Mae said in its deposition at record 4928, and this is page 14 of our reply brief, Fannie Mae admits in its deposition that it exercised complete control over payments to foreclosure counsel, who was Underwood in this case. The letters that Mr. Underwood sent, and just so I'm clear, just in case it was misconstrued earlier, says, on behalf of GMAC, the owner and holder, or agent, or agent, we're here on agency, agent, for the owner and holder of the above reference mortgage, your honors, the owner was Fannie Mae. That letter says GMAC is an agent of Fannie Mae, what we're here today, and the Underwood sites are 5151 through 5155, 9823, 9827, and I didn't have a chance to find it in my principal brief, but it's on page 14 of the reply brief, and that's where the, that's where the excerpt from the, uh, the letter is. Let's furnish us, furnish the court a letter referencing these sites that you've now made with a copy to Mr. Twyford. Yes, your honor. And if he wants to respond with different citations to the record that they contradict that, he may do that, but we don't want any argument. Yes, your honor. And, and, and briefly in closing, I heard the phrase, uh, to prove agency, you gotta get down in the weeds, controlling it. I looked through the Mississippi case law, how is it down in the weeds, like in the Walker case, where the only evidence of agency was that the principal said that we're gonna provide insurance. How, how is that getting down and dirty with the day-to-day affairs? It's not. How is it down in the weeds, uh, in, uh, uh, the insurance, the font case, where they say the only evidence of agency is we own your records that you keep. That's not getting down and dirty in the day-to-day affairs. That's not part of the test. The test is control and the ability to control, which we, we think has been proven extensively far and beyond what Mississippi case law requires for it to create a jury issue. We're not asking the court to find this is an agency relationship as a matter of law every single time, but on the facts of this case, it is very much a jury issue. Thank you, your honors. Okay, thank you, Mr. Anderson. Call the next case.